Joseph A. Fanelli and Mary Steger Fanelli v. Commissioner.
Fanelli v. Commissioner
Docket No. 80764.
United States Tax Court
T.C. Memo 1961-313; 1961 Tax Ct. Memo LEXIS 36; 20 T.C.M. (CCH) 1617; T.C.M. (RIA) 61313; November 15, 1961
*36 Joseph A. Fanelli, pro se., 1701 K St., N.W., Washington, D.C., W. Ralph Musgrove, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined deficiencies in petitioners' income taxes for the years 1955 and 1956 in the respective amounts of $537.80 and $2,151.98. In view of various concessions made by petitioners at the trial, the only question remaining for our decision is whether certain payments made to petitioners in the years 1955 and 1956 by a motion picture company are includible in gross income for those years. Findings of Fact Petitioners are husband and wife who reside in Arlington, Virginia. They filed joint Federal income tax returns for the taxable years 1955 and 1956 with the district director of internal revenue at Richmond, Virginia. Petitioner Joseph A. Fanelli (hereinafter referred to as petitioner) represents himself and his wife, the other petitioner, in this proceeding. He is a lawyer and a member of the bars of the State of New York and the District of Columbia. Sometime in August 1953 petitioner agreed to represent a Navy Department employee who had been suspended from his job for security reasons arising *37 from a charge that he was the leader of a communist group in his community. Petitioner was successful in this endeavor, and in September 1954 the employee was reinstated in his job with full back pay for the period of his suspension. Petitioner received a fee for these services which he duly reported for Federal tax purposes. Petitioner felt at the time of accepting this employment that any public identification of himself as counsel in a case concerned with communism would hurt him professionally and personally, but was of the opinion that there would be no public reporting of the case since so-called security cases are generally confidential. About a year later, during the fall of 1955, petitioner learned that his former client and Twentieth Century-Fox Film Corporation, hereinafter sometimes referred to as Twentieth Century-Fox, were negotiating with a view toward making a motion picture based upon this episode. Petitioner considered the making of such a motion picture would be damaging to him professionally, and he unsuccessfully urged his former client to discontinue the negotiations. Petitioner then sought advice as to his rights in this matter from a former law school classmate *38 who was familiar with legal problems arising in the motion picture industry. He was informed that the industry recognized an individual's right of privacy and that no producer would proceed to make a motion picture in the face of a serious threat of an injunction proceeding by anyone likely to be publicly identified with a role portrayed in a film. Petitioner also learned that Twentieth Century-Fox maintained its business headquarters in the city of New York, and he retained a New York lawyer to convey his objections to the proposed film to the producers. He was told that the film company had decided to abandon the project. However, about 2 or 3 weeks later it was revived. After several weeks of negotiations, it was agreed that if Twentieth Century-Fox made a motion picture based upon the security risk case involving petitioner's former client the film company would pay petitioner the amount of $7,500 in exchange for petitioner's foregoing his right to interfere with the making of the motion picture. Twentieth Century-Fox produced and exhibited a motion picture based upon petitioner's security case and titled it "Three Brave Men." The film was publicly exhibited throughout the *39 country beginning in 1957, with most of the exhibitions taking place in 1957 and 1958. One of the roles portrayed a lawyer named "Joe DeMarco." Petitioner is usually known as "Joe Fanelli." Unamed acquaintances of petitioner in New York, San Francisco, Honolulu, and Washington identified him with the role of "Joe DeMarco" in the film. Petitioner did not write anything about this case for publication, and he did not give Twentieth Century-Fox any papers, books, documents, advice, or assistance of any kind. Pursuant to the settlement agreement with Twentieth Century-Fox, petitioner was paid the $7,500 agreed upon by the parties. Of this amount $750 was retained as a fee by petitioner's New York counsel. Petitioner received $900 of the balance in 1955 and $5,850 in 1956. He attached statements to his income tax returns for these years acknowledging the receipt of the money which he claimed was not income because it was a payment in advance for anticipatory breach of privacy. Petitioner has lived in 6 different states and the District of Columbia and he draws his law practice from all over the United States, a large part of it being referred to him by other lawyers in large cities *40 who require local Washington representation. His professional and personal acquaintances often engage him to represent clients and friends in so-called Federal matters in and around Washington, D.C. For the years since 1954, and including 1959, petitioner's net income from professional services exceeded $20,000, except in 1958 when his net income was approximately $10,000. Petitioner received the sums of $900 and $5,850 in the years 1955 and 1956, respectively, for the contractual surrender of his right of privacy. Opinion KERN, Judge: In the recent case of , on appeal (C.A. 2, May 9, 1961), this Court held that money received by a taxpayer as compensation for a waiver of possible invasion of his right of privacy would be taxable as ordinary income, citing ; ; and . In another opinion filed the same day (January 26, 1961) in the case of , on appeal (C.A. 9, March 23, 1961), we held to the same effect but added the qualification "without some showing *41 of an injury which has been sustained" (p. 649), although we expressed some doubt (p. 648) as to the validity of this qualification. But cf. , where the Court by way of dictum expressed the opinion that where a taxpayer actually sustained damage through invasion of privacy a payment received in anticipation of and prior to the sustaining of such damage would not be income. In the instant case, as in the Starrels and Meyer cases, we are not compelled to answer this question because, as in those cases, the taxpayer has not proved that actual personal damage was sustained by him as a result of an invasion of privacy. Petitioner's evidence on this point is that unnamed acquaintances of his in 4 cities identified him in their minds with the attorney portrayed in the motion picture, and that his professional income decreased in the year 1958. There is no evidence in the record, other than petitioner's own conjecture, that the decrease in his income for that year was anything more than a coincidence or was caused in any way by the exhibition of the motion picture. Decision will be entered for the respondent.